

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | | |
|---|---|---|
| C. WILLIAM HINNANT, Jr., M.D., d/b/a Anderson Urology Associates, P.A., | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CIVIL ACTION NO. 8:03-01345-HFF |
| ANMED HEALTH RESOURCES, INC., d/b/a Anderson Area Medical center, UROLOGICAL SURGERY ASSOCIATES, P.A., STONEY ABERCROMBIE, MD, DOLE BAKER, MD, PAUL BRILL, MD, SALLIE CARTER, MD, JOHN DAVIES, MD, RUSSELL DODDS, MD, BILL DUNLAP, MD, DAN FLEMING, MD, PAUL FRASSINELLI, MD, MICHAEL GRIER, MD, DUANE HENK, MD, KASHFIA HOSSAIN, MD, PAIGE HUBER, MD, ED LOMINACK, MD, RAVINDER MALIK, MD, DAVID MARTOCCIA, MD, STEVE MCELVEEN, MD, MARSHALL MEADORS, MD, JOHN NORDEEN, MD, HUGH OSBURN, MD, GREGG SEYMOUR, MD, CHARLES SONU, MD, MIKE TILLIRSON, MD, | § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § § | |

---

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

This is an antitrust case filed pursuant to 15 U.S.C. §§ 1 and 2.  Plaintiff has also asserted

various related state claims.  The Court has jurisdiction over this action under 28 U.S.C. §§ 1331

1

and 1367(a).  Pending before the Court is Defendants' motion for summary judgment.  Having

carefully considered the motion, the response, the record, the oral arguments of the parties, and

the applicable law, it is the judgment of this Court that Defendants' motion for summary

judgment be granted.

## II.     FACTUAL AND PROCEDURAL HISTORY

### A.     Procedural History

Defendant Anderson Area Medical Center, Inc. (the "Medical Center")[1] is a private not-for-

profit, general acute care hospital located in Anderson, South Carolina.  The individually-named

defendants are physicians who are members of the Medical Executive Committee of the Medical

Center (hereinafter collectively referred to as "MEC Members").  Plaintiff is an urologist who

formerly was an active medical staff member and held privileges to provide medical and surgical

urology services to Medical Center patients.

On January 6, 2003, the Board of Trustees of the Medical Center revoked Plaintiff's medical

staff membership and health system privileges.  This revocation of Plaintiff's privileges occurred as

the final step in a peer review process at the Medical Center that included evidentiary and appellate

hearings.

On April 14, 2003, Plaintiff sued the Medical Center, the MEC Members who participated

in the peer review process, and Urologic Surgery Associates, P.A.,[2] an Anderson area urology

practice.  Plaintiff alleges the peer review action that resulted in the revocation of his privileges was

in "bad faith" and "grossly flawed." Am. Compl.  More particularly, Plaintiff contends that the peer

---

[1] Defendant Medical Center is inaccurately denominated as "AnMed Health Resources, Inc., d/b/a Anderson Area Medical Center" in the caption.

[2] Defendant Urologic Surgery Associates, P.A. is inaccurately denominated as "Urological Surgery Associates, P.A." in the caption.

review action was not based upon legitimate concerns with his medical judgment or the quality of care he provided to patients, but instead was a plot by his economic competitors. *Id.*

Plaintiff asserted the following causes of action against Defendants:

    (1) antitrust claim under 15 U.S.C. § 1 (conspiracy in restraint of trade)
    (2) antitrust claim under 15 U.S.C. § 2 (monopolization)
    (3) state law antitrust claim under S.C. Code Ann. § 39-3-10
    (4) state law antitrust claim under S.C. Code Ann. & 39-3-130
    (5) unfair trade practices claim under S.C. Code Ann. § 39-5-20
    (6) violation of S.C. Code Ann. § 44-113-30 (self-referral)
    (7) violation of S.C. Code Ann. §  44-113-60(B) (anti-kickback)
    (8) negligent peer review
    (9) breach of contract
    (10)  tortious interference with existing and prospective contractual relationships
    (11) intentional infliction of emotional distress
    (12) defamation
    (13) civil conspiracy
    (14) violation of South Carolina peer review immunity statute
    (15) violation of the Health Care Quality Improvement Act ("HCQIA")

*Id.*

Shortly before February 1, 2005, the deadline established for dispositive motions in the Amended Scheduling Order, Plaintiff notified Defendants by letter to counsel of his intent to voluntarily dismiss ten claims alleged in his Amended Complaint *with prejudice*. Mem. Supp. Summ. J. at 3; *see also* Mem. Opp'n Summ. J. at 46-66.[3]  Plaintiff also agreed to dismiss all claims made against Defendant Urologic Surgery Associates, P.A.  *Id.*

Therefore as a ruling preliminary to the ruling on the instant motion for summary judgment, the Court dismisses *with prejudice* all claims asserted by Plaintiff in this action against Defendant

---

[3] Although Plaintiff never filed a motion dismissing these claims, he did not brief the ten causes of action in his memorandum in opposition to Defendants' summary judgment motion, nor has he challenged Defendants' representation of his expressed intent to dismiss these claims with prejudice.

Urologic Surgery Associates, P.A., and also dismisses *with prejudice* all causes of action against the remaining Defendants except the following:

    (5)   unfair trade practices claim under S.C. Code Ann. § 39-5-20
    (8)   negligent peer review
    (9)   breach of contract
    (10) tortious interference with existing and prospective contractual relationships
    (11) intentional infliction of emotional distress

On February 1, 2005, Defendants Medical Center and the MEC Members moved for summary judgment on Plaintiff's remaining claims in this action. Mot. Summ. J.  The parties exhaustively briefed this motion.  A hearing on Defendants' motion for summary judgment was held on July 28, 2005, in Spartanburg at which time oral arguments were offered by the parties.  For the reasons set forth below, the Court grants Defendants' motion for summary judgment.

**B.    Factual Findings**

    **1.    <u>Overview of the Peer Review Action</u>**

The peer review action involving Dr. Hinnant that is the subject of this case began at the Medical Center in 2002.  In May - August 2002, four of Plaintiff's cases were identified by the Medical Center's generic screening process as cases that required further peer review.  These cases were first reviewed by at least eight physician members of the Surgical Case Review Committee.  During August - December 2002 these cases were analyzed, considered, and evaluated in several meetings of the Medical Executive Committee ("MEC").  The MEC is the medical staff governing body that consists of twenty-three physicians who at the time of the underlying peer review were the chiefs of the various hospital departments.

The record of the deliberations regarding these four cases, in the form of meeting minutes and testimony of the more than 30 physicians who participated in the review, reveal that not a single

member of the medical staff objected to the finding that Plaintiff exercised poor medical judgment in his treatment of these four patients.  The Medical Staff Hearing Committee, a three-physician panel of medical staff members appointed to conduct an evidentiary hearing on these cases, agreed as well.  Finally, by a nearly unanimous decision, the Medical Center's Board of Trustees reached the same conclusion in January 2003.  During the eight-month peer review process that culminated in the Board's revocation of Plaintiff's privileges, over 45 persons, including some 35 physicians, found Plaintiff's medical judgment distressing and badly flawed.

## 2.     **Cases Under Review**

### a.     **ER/Nephrectomy Case**

On May 14, 2002 the Surgical Case Review Committee undertook a review of Plaintiff's conduct concerning a November 2001 critical care nephrectomy patient. Ex. 7 at ¶¶ 4-19; Ex. 8 at ¶¶ 6-9, Mem. Supp. Summ. J.  This case involved a patient upon whom Plaintiff had performed a nephrectomy (removal of a kidney).  On the same day the patient was discharged following the procedure, she presented in the Emergency Department in critical condition. Ex. 8 at ¶¶ 6-9, Mem. Supp. Summ. J.  The patient was anemic and a CT scan of her abdomen showed substantial abdominal hemorrhaging.  *Id.*  The Medical Director of the Emergency Department personally spoke with Dr. Hinnant by phone to advise him of the critical condition of his patient and to inform Hinnant that he believed the patient needed "immediate attention." *Id.* at ¶ 8.  The Medical Director believed this phone conversation provided Dr. Hinnant with "a clear understanding of the grave seriousness of this patient's condition." *Id.*

5

Notwithstanding this phone conversation, Dr. Hinnant did not arrive at the Emergency Department as expected.[4]  Throughout the next hour, the patient's condition deteriorated.  Ex. 9, Mem. Supp. Summ. J.  The patient was admitted to the intensive care unit and nurses made repeated calls to Dr. Hinnant, but were mistakenly dialing the home of his father.  Ex. 7 at ¶¶ 13 and 18, Mem. Supp. Summ. J.  Meanwhile, the nephrologist who had also been involved in the patient's case was at the hospital and requested the assistance of a general surgeon and another urologist.  Ex. 9, Mem. Supp. Summ. J.  In Dr. Hinnant's absence, the urologist and surgeon took the patient to the operating room to perform surgery to stop the bleeding.  *Id.*  Dr. Hinnant arrived after the patient had already been stabilized, over four hours after the patient's arrival in the intensive care unit.  Ex. 7 at ¶ 11, ex. 1, Mem. Supp. Summ. J.

On August 6, 2002, the MEC took up consideration of this case.  The leadership of the MEC recommended that Dr. Hinnant be issued a written reprimand with the condition that all of Dr. Hinnant's critical care admissions would be reviewed for one year and that any other cases being processed through generic screens would also be intensively reviewed.  Ex. 9, Mem. Supp. Summ. J.  In approving their leadership's recommendation, members of the MEC expressed their shock over Dr. Hinnant's failure to respond promptly to the needs of his patient.  Ex. 1 at ¶ 18, Mem. Supp. Summ. J.

The August 7, 2002 written reprimand set forth the MEC's concerns regarding the ER/Nephrectomy case that included:  (1) failure timely to see his patient when Dr. Hinnant's phone admission orders indicated a clear understanding of the patient's critical condition, (2) poor judgment in choosing not to come in to see his patient, and (3) inaccurate characterization of the case

---

[4] Dr. Hinnant asserted that he asked to be called when the patient was transferred.  No peer reviewer, however, found this assertion, even if true, was sufficient justification for Hinnant not timely coming to see his patient.

in Dr. Hinnant's medical charting. Ex. 7 at Ex. A, Mem. Supp. Summ. J. Dr. Hinnant accepted the written reprimand and thereby "acknowledged" his "actions which led to the above concerns and reprimand." *Id.*

Within a week of the MEC's August 2002 decision to reprimand Dr. Hinnant and place his future cases under a heightened standard of review, two additional cases involving Dr. Hinnant's care of patients were identified through the generic screening process. Ex. 7 at ¶ 22, Mem. Supp. Summ. J. A third case was identified the next month.[5]

### b.     Pediatric Urology Case

The first of the three additional cases involved a 15-month old pediatric patient. This patient had undergone a bilateral urethral reimplantation procedure performed by Dr. Hinnant. *Id.* at ¶¶ 22-23. Reportedly, after this procedure the patient's creatinine level was abnormally high and continued to rise, and her abdomen became distended. Ex. 11 at 4, Mem. Supp. Summ. J. Dr. Hinnant administered the diuretic Lasix, but otherwise did not surgically intervene for seven days. The pediatric patient's chart showed that she was retaining fluid (possibly urine) and that this fluid was a post-surgical leak into her chest cavity restricting her breathing. Ex. 7 at ¶ 26, Mem. Supp. Summ. J. There were also concerns that Dr. Hinnant failed to request a consultation with a pediatrician sooner and operate on the patient in a timelier manner before the respiratory compromise occurred. *Id.* According to one surgeon who reviewed this case on both the Surgical Case Review Committee and the MEC, Dr. Hinnant's decision to return such a small child having breathing difficulties to surgery, knowing that the Medical Center did not have a pediatric intensive care unit, was a poor

---

[5] Each of these cases occurred before the August 7th written reprimand, but in the standard course of the Medical Center's peer review process these cases were not considered by the Surgical Case Review Committee until after the date of the written reprimand.

surgical decision. *Id.* When Dr. Hinnant finally did consult a pediatrician after the second surgery when the infant could not be adequately ventilated, a decision was made to transfer the child to the pediatric intensive care unit at Greenville Memorial Hospital under the care of a pediatric nephrologist and a pediatric urologist. Ex. 11 at 4, Mem. Supp. Summ. J.

> **c.** **Flash Fire Case**

The second additional case identified through generic screening and presented to the Surgical Case Review Committee after the ER/Nephrectomy case involved a flash fire in the operating room. The Committee was presented information about the incident involving Dr. Hinnant's use of Duraprep, which contains alcohol, during a cystoscopic procedure. The generic screen form contained detailed information describing the warning the operating room staff gave Dr. Hinnant about the flammability of the agent and the need to allow time for it to dry. Ex. 7 at ¶ 27, Mem. Supp. Summ. J. The Committee also reviewed Dr. Hinnant's reply to the screen in which he contends that no one informed him of flammability hazards and that the operating room staff were not truthfully relating what occurred. *Id.*; *see also* Ex. 16, Mem. Supp. Summ. J. Moreover, Dr. Hinnant provided a statement of the anestheologist on the case. This physician did not recall hearing any warning or other discussion of the use of the agent. Ex. 5, Mem. Reply.

The Committee reviewed the statement signed by three individuals who staff the operating room as well as their supervisor. All three individuals, consisting of two nurses and a technical assistant, attest to the fact on a comment for generic screening that Dr. Hinnant was informed that the agent contained alcohol and that the prep was not allowed to dry before he began to make the incision. Ex. 17, Mem. Supp. Summ. J. After reviewing the generic screen report and Hinnant's

response, the Committee concluded that the flash fire was a preventable, unacceptable event.  Ex. 7 at ¶ 29, Mem. Supp. Summ. J.

### d.     Wound Care Case

At the September 2002 Surgical Case Review Committee meeting, the third additional case involving Dr. Hinnant's problematic care was identified through the generic screening process.  Ex. 7, Mem. Reply.  A nurse reported she observed Dr. Hinnant manipulating the patient's wound without gloves and packing the patient's abdominal cavity with Kerlex sponges without gloves.  Ex. 18, Mem. Supp. Summ. J.  Another nurse reported she saw Dr. Hinnant using the telephone in the nurses station following this procedure and that he had blood on his hands.  Ex. 7 at ¶ 31, Mem. Supp. Summ. J.

Dr. Hinnant stated in his response to this screen that the nurse's report was a complete fabrication and that it was part of a continuing pattern of baseless and false accusations by this nursing unit.  Ex. 19, Mem. Supp. Summ. J.  Dr. Hinnant also indicated that the Committee should see as significant the fact the patient's wound had healed without infection.  Ex. 7 at ¶ 32, Mem. Supp. Summ. J.  Finally, Dr. Hinnant identified a physician who he said could exculpate him.  This physician provided a statement that stated he did not recall anything improper occurring.  Ex. 5, Mem. Reply.

The Surgical Case Review Committee concluded that Dr. Hinnant may have performed at least a portion of this procedure without wearing sterile gloves.  A surgeon on the Committee affirmed that he was not only concerned about the break in sterile technique, but again that Dr. Hinnant's response involved blame shifting and a focus on an ultimately positive patient outcome.

Ex. 7 at ¶ 33, Mem. Supp. Summ. J.  He felt this response was indicative of Dr. Hinnant's overall lack of insight and his inability to see the importance of candor and reflective self-evaluation during the peer review process.  *Id*.

### 3.     MEC's Consideration of the Three Cases Under Intense Review

As part of the focused medical review of Dr. Hinnant's cases that resulted from his August 7, 2002, reprimand, the Surgical Case Review Committee's findings on these three additional cases were forwarded to the MEC.  At the November 5, 2002, MEC meeting, the medical staff officers presented information about each of these cases.

Dr. Hinnant was asked by the MEC to appear before a special called meeting of the Committee on November 12, 2002, to discuss the three cases.  Ex. 11, Mem. Supp. Summ. J.  He continued to deny any responsibility for the incidents involving the operating room fire and the sterile breach.  *Id*.; Ex. 7, Mem. Supp. Summ. J.  With respect to the pediatric case, Dr. Hinnant agreed that he "dropped the ball," he "was not up to par" on this case, and that he could have done things differently to avoid the surgical complications altogether or to at least address them earlier.  *Id*.; Ex. 11 at 5. Mem. Supp. Summ. J.  In fact, during an extended statement to the MEC about the care given to his pediatric patient, Hinnant described the following errors he made in his handling of the infant's case:

> .  lack of daily weights
> .  late involvement of pediatrics
> .  unaware of normal creatinine level for infant
> .  failure to check creatinine level on admission
> .  should have acted sooner to address the increase in abdominal girth
> .  failed to appreciate urinary leak
> .  would have stented both ureters
> .  would have stented sooner

*Id.* These admissions by Plaintiff reflected many of the concerns shared by members of the Surgical Case Review Committee, MEC, and the Medical Staff Hearing Committee.

Even after Dr. Hinnant's comments about the pediatric case, the MEC Members did not believe that he demonstrated a credible ability to exercise the basic judgment and compassion for patients that is needed to prevent serious, if not catastrophic, consequences and complications. Ex. 7 at ¶ 43, Ex. 8 at ¶ 12, Ex. 1 at ¶¶ 6-10 and 21, Mem. Supp. Summ. J. The nephrectomy patient's death and these three additional matters were all evidence of the kinds of events and complications that the MEC was concerned would continue to result from his lack of judgment, care, and concern. In particular, there were concerns that Dr. Hinnant's own comments and testimony evidenced a demeanor and attitude indicative of him not understanding either at the outset of a case or in retrospect his professional or personal limitations, resulting in failure to seek timely consultations, failure to recognize and respond to complications, and failure to accept responsibility for these shortcomings. Ex. 7 at ¶ 43, Mem. Supp. Summ. J.

Comments expressed by MEC Members who had served on the MEC when Dr. Hinnant was disciplined in 1995 and 1996 showed their concern that the pattern was longstanding. The MEC Members were alarmed that the current issues mirrored the type of conduct upon which prior review proceedings were based, including the failure to exhibit the appropriate level of concern to anticipate patient needs and prevent patient problems before they occur. Ex. 8 at ¶ 12, Ex. 1 at ¶ 19, Mem. Supp. Summ. J.

Following the special called meeting of the MEC on November 12, 2002, the MEC deliberated extensively and concluded from the events surrounding the above-referenced reprimand, the results of the more recent case reviews, and Plaintiff's conduct and comments during the personal

11

interview that Plaintiff was exhibiting a pattern of continued problems with medical decision-making and clinical judgment.  Ex. 7 at ¶44, Ex. 8 at ¶¶ 11-14, Ex. 1 at ¶¶ 12-19, Ex. 5 at ¶¶ 6-8, Mem. Supp. Summ. J.

The MEC determined that the revocation and summary suspension of Plaintiff's clinical privileges was necessary to preserve quality of patient care and to protect patient safety.  *Id.*  The Committee immediately notified Plaintiff orally of its decision to suspend summarily his clinical privileges and of its decision to recommend to the Medical Center's Board of Trustees the revocation of Plaintiff's medical staff membership and clinical privileges.  Ex. 7 at ¶ 44, Mem. Supp. Summ. On November 14, 2002, the MEC also provided Dr. Hinnant with written notice of its action.  Ex. 21, Mem. Supp. Summ. J.  In addition to citing the poor clinical judgment in the three cases, the notice stated that "[t]hese deficient practices coupled with your recent formal reprimand and history of disciplinary action justify the revocation now recommended.  The MEC believes this is the only sanction available [adequately preserving] the integrity of the Medical Center's patient safety interest."  *Id.*

### 4.    Medical Staff Hearing Committee Proceeding

Following receipt of notice of the summary suspension, Plaintiff requested a hearing pursuant to the Fair Hearing Plan of the Medical Staff Bylaws.  The Medical Staff appointed a Medical Staff Hearing Committee ("Hearing Committee") pursuant to the Fair Hearing Plan.  On November 21, 2002, the Plaintiff appeared before the Hearing Committee represented by two attorneys and himself (Plaintiff is a member of the South Carolina Bar).  Plaintiff called witnesses and presented evidence on the cases at issue.  Plaintiff also testified at this hearing.

12

The Hearing Committee closed its hearing upon receipt of a written closing statement from the MEC on November 25, 2002.  Following deliberations, the Hearing Committee issued its report to the MEC on December 3, 2002, finding that Dr. Hinnant had exercised poor judgment and acted in ways that unnecessarily jeopardized patient health in each of the three cases.  Ex. 22, Mem. Supp. Summ. J.  More specifically, the Hearing Committee made the following findings:

> We find that Dr. Hinnant exercised poor clinical judgment and failed to meet the standard of care by not utilizing gloves when removing staples from the patient.
>
> We find Dr. Hinnant used poor clinical judgment and endangered the patient, the medical staff present during the procedure, and himself when he used an alcohol based prep inappropriately after being warned by two members of the surgical team of the risk.
>
> We find that Dr. Hinnant used poor clinical judgment in failing to recognize and timely and appropriately treat complications resulting from the patient's initial surgery for reflux.

*Id.* at 4.

With respect to the evidence of the prior disciplinary actions the MEC had taken against Plaintiff, the Hearing Committee stated that it was "greatly distressed" by the events related to the nephrectomy patient death.

> We did not believe that the issue was Dr. Hinnant, Jr. being called at the wrong number by the nurse in the ICU.  We feel a reasonable physician would have gone in to evaluate the patient after receiving the first call from the ER.

*Id.* at 4.

The Hearing Committee found that the evidence of Dr. Hinnant's prior practice and medical staff discipline "tends to establish a pattern of poor clinical judgment exercised by Dr. Hinnant." *Id.* The Hearing Committee stated it was concerned that the pattern may represent a risk to patients. *Id.* The Hearing Committee concluded, however, that the evidence introduced to it by the MEC about

13

Plaintiff's disciplinary and practice history was insufficient to establish a pattern beyond the three cases that prompted the MEC adverse action, and therefore recommended that the suspension should be lifted in part. *Id.* It noted, nonetheless, that suspension or revocation of Dr. Hinnant's privileges could be warranted (1) pending the MEC's consideration of an independent review by a qualified pediatric urologist and (2) by Dr. Hinnant's recent reprimand for the nephrectomy patient death and the history of other disciplinary actions. *Id.* at 5.

### 5. MEC's Consideration of Hearing Committee Recommendation

The MEC met on December 3, 2002 and December 16, 2002, to consider the Hearing Committee's report, and to undertake those matters within its control recommended by the Hearing Committee. Ex. 7 at ¶¶ 48-51, Ex. 8 at ¶ 19, Ex. 5 at ¶¶ 13-14, Mem. Supp. Summ. J.

#### a. Hinnant's History of Professional Problems at the Medical Center

The MEC reviewed Dr. Hinnant's history of disciplinary actions at the Medical Center using a timeline. Ex. 27 at 2, Ex. 7 at Ex. 3, att. 3, Mem. Supp. Summ. J. That history included Plaintiff's early difficulties at the Medical Center. Within three months of becoming a provisional member of the Medical Center medical staff in June 1994, two of Dr. Hinnant's patients died following urologic procedures. *Id.*; Ex. 1 at ¶ 13, Mem. Supp. Summ. J. Of the nine deaths that occurred in the Urology Department in 1994, eight of those patients had been under the care of Dr. Hinnant, even though he had been on staff for only half of the year. *Id.* at ¶ 14.

As a result of persistent questions concerning the exercise of his medical judgment, Dr. Hinnant was denied the standard elevation from provisional to active medical staff membership at the conclusion of his first year at the Medical Center. *Id.* at ¶ 15. In fact, the prospects for resolution

of Dr. Hinnant's problems were so bleak that the MEC determined within the next year that he should be removed from the medical staff.  *Id.*

Dr. Hinnant challenged, under the Medical Center's Medical Staff Bylaws, the proposed action of the MEC to terminate his privileges in 1995.  After a hearing before a peer review panel, the MEC modified its recommendation and permitted Dr. Hinnant to take a one-year leave of absence to enroll in a training program to emphasize the clinical practice of urology.  Ex. 2 at ¶ 1, Mem. Supp. Summ. J.

In early 1997, Dr. Hinnant applied to reinstate his privileges at the Medical Center.  On May 5, 1997, however, the Board of Trustees, upon the recommendation of the MEC, suspended the monitoring program and approved Dr. Hinnant's application to reinstate his active privileges on a provisional basis.  Ex. 4, Mem. Supp. Summ. J.  Dr. Hinnant was advanced to unrestricted active staff status in 1999.  Ex. 5 at Ex. A,  Mem. Supp. Summ. J.

After review of the history, the MEC Members expressed concern that the timeline "clearly demonstrates that when placed under a microscope the physician performs in a manner that is expected of him but when out from under a microscope what appears to be a character flaw returns and it is felt that this is this same character flaw that will not change."  Ex. 27 at 4, Mem. Supp. Summ. J.

### b.    MEC's Recommendation to Board of Trustees

After consideration of Dr. Hinannt's troubled disciplinary history and the external report by a board-certified pediatric urologist, and further analyzation of the cases that had been the recent focus of their attention, the MEC decided by a vote of 13 to 1 to reaffirm its recommendation that Dr. Hinnant's privileges and medical staff membership should be revoked.  *Id.* at 5.  The MEC

15

expressed concerns for the safety of future patients and believed that "events of this seriousness and

dangerous nature are highly likely to recur. . ." if Hinnant retained his privileges  *Id.* at 4-5.  In

support of its recommendation, MEC Members expressed the following health care quality concerns

that arose from their consideration of Dr. Hinnant's medical staff history, the four cases brought to

the MEC's attention in 2002, and their observations of Dr. Hinnant based on his November 12, 2002,

meeting with the MEC and his subsequent testimony before the Hearing Committee:

> A disturbing pattern of substandard behavior over a period of more than 7 years.
> Repeated incidents of apparent lack of concern and judgment in caring for post-operative patients.
> Substandard general medical decision-making.
> Concern for Dr. Hinnant's veracity in testimony before the hearing committee and the MEC.
> Dr. Hinnant's history of medical staff disciplinary action.
> Apparent lack of concern by Dr. Hinnant of patient and staff safety and infection control issues.
> Dr. Hinnant's unfounded denial of fault and failure to accept responsibility for certain conduct.
> The Hearing Committee's acknowledgement of the MEC's findings.
> Certain admissions of substandard care made by Dr. Hinnant to the MEC.
> Concern by the MEC that lesser sanctions would be ineffective to preserve patient care and safety expectations.

*Id.* at 5.  On December 18, 2002, Dr. Hinnant was notified of the MEC's recommendation. Ex. 15,

Mem. Reply.

### 6.    **Board of Trustees Appellate Review**

Exercising his rights under the Medical Staff Bylaws Fair Hearing Plan, Plaintiff requested

an appellate hearing before the Medical Center's Board of Trustees.  An appellate hearing was

conducted on January 6, 2003.  Ex. 23 at ¶ 3, Mem. Supp. Summ. J.  At the conclusion of the

appellate hearing and following deliberations, the Board of Trustees found that Dr. Hinnant's

conduct raised serious and persistent questions about his clinical judgment. *Id.* at ¶ 13-15; Ex. 17 at ¶¶ 10-11, Mem. Reply.

In addressing the merits of the issue presented, Medical Center Board of Trustees Chairman William Kibler explained that the Board considered the three most recent cases in light of a disturbing history of patient care problems, particularly the nephrectomy patient death. Ex. 23, Mem. Supp. Summ. J. at ¶ 13. Moreover, the Board was concerned about the findings of Dr. Hinnant's lack of truthfulness before both the MEC and the Hearing Committee. *Id* at ¶ 14. After hearing all the evidence, the Board felt it could no longer "responsibly continue to entrust Medical Center patients to his care." Ex. 17 at ¶11, Mem. Reply. After a thorough hearing and deliberation, the Board voted by an overwhelming margin to revoke Plaintiff's medical staff membership and clinical privileges. Ex. 23 at ¶ 7, Mem. Supp. Summ. J.

## III.    DISCUSSION

Defendants assert that summary judgment is proper as to Plaintiff's legal claims because the peer review action described above satisfies the prerequisites for damages immunity set forth in the Health Care Quality Improvement Act ("HCQIA"). 42 U.S.C. §§ 11111(a)(1) & 11112(a). Defendants also assert that summary judgment on Plaintiff's equitable claims should be granted. The Court agrees with Defendants on both accounts.

### A.    <u>Health Care Quality Improvement Act</u>

If a professional review action (more commonly known as a "peer review action") at a hospital complies with certain conditions, hospitals and the physicians on the medical staff are entitled to immunity from claims for monetary damages that arise from peer review activities.

> If a professional review action [peer review action] of a professional review body meets all the standards specified in section 11112(a) of this title . . .

17

(A)  the professional review body,
(B)  any person acting as a member or staff to the body,
(C)  any person under a contract or other formal agreement with the body, and
(D)  any person who participates with or assists the body with respect to the action,

*shall not be liable in damages* under any law of the United States or of any State (or political subdivision thereof) with respect to the action.

42 U.S.C. § 11111(a)(1)(emphasis added); *Wieters v. Roper Hosp. Inc.*, No. 01-2433, 2003 W.L. 550327, at *4 (4th Cir. Feb. 27, 2003)("The HCQIA provides that 'professional review bodies,' and their members and staff, taking 'professional review actions' shall not be liable in damages under state or federal law as long as the actions satisfy certain conditions.").

A hospital and its medical staff are entitled to immunity from damages if the peer review action at issue was taken:

(1)  in the reasonable belief that the action was in the furtherance of quality health care;
(2)  after a reasonable effort to obtain the facts of the matter;
(3)  after adequate notice and hearing procedures are afforded to the physician or after such other procedures as are fair to the physician under the circumstances; and
(4)  in the reasonable belief that the action was warranted by the facts known.

42 U.S.C. § 11112(a).

Congress granted peer reviewers this immunity to encourage physicians to engage in meaningful critiques of each other's patient care without fear of reprisal in the form of suits seeking monetary damages. *Oksanen v. Page Mem. Hosp.*, 945 F.2d 696, 708 (4th Cir. 1991) (noting that Congress intended HCQIA to protect peer reviewers from the threat of damages, and further that Congress expressly recognized "'[t]here is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review.'") (quoting 42 U.S.C. § 11101(4)).  Rigorous peer review, coupled with the reporting of sanctions to a national databank, is a core component of federal policy to protect patients from incompetent and dangerous physicians

18

who could otherwise move from hospital to hospital without discovery and disclosure of their past problems.  42 U.S.C. § 11101(2).

Providing further protection to peer review participants, HCQIA provides a *statutory presumption* that the peer review action at issue satisfies the four prerequisites for damages immunity.

> A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.

42 U.S.C. § 11112(a).

### B.     HCQIA Summary Judgment Standard

The statutory presumption provided by HCQIA shifts the burden of proof and persuasion at the summary judgment stage onto the sanctioned physician plaintiff.  Thus when considering whether HCQIA immunity applies, the Court weighs the physician's evidence of non-compliance against the presumption that each element of the HCQIA standards was satisfied and the evidence of compliance offered by the peer reviewers.  Summary judgment for the peer reviewers is appropriate unless a reasonable jury, viewing the facts in the best light for the Plaintiff, could conclude that the plaintiff has shown *by a preponderance of evidence* that defendants' actions failed to satisfy the HCQIA standards.  *Gabaldoni v. Washington Cty. Hosp.*, 250 F.3d 255, 260 (4th Cir. 2001).  A physician plaintiff thus cannot avoid summary judgment merely by raising a genuine issue of material fact as to whether one of the HCQIA standards was satisfied.

C.    **Application of HCQIA Standards**

    1.    **Action taken in the reasonable belief that it was in the furtherance of quality healthcare**

The first element of HCQIA is satisfied if, looking at the totality of the circumstances, the peer review action was undertaken by Defendants "in the reasonable belief that quality healthcare was being furthered." 42 U.S.C. § 11112(a)(1). We agree with the formulation of our sister court that HCQIA calls for a "generous application of the concept of reasonableness" at the summary judgment stage similar to the "typical judicial review of administrative decisions and of such things as internal procedures for terminating membership in voluntary associations." *Lee v. Trinity Lutheran Hosp.*, No. 00-0716-CV-W-HFS, 2004 W.L. 212548, at *7 n. 5 (W.D. Mo. Jan. 29, 2004). This HCQIA element does not require, however, that the peer review decision be medically correct or that the decision actually improve the quality of health care. *Imperial v. Suburban Hosp. Ass'n Inc.*, 37 F.3d 1026, 1030 (4th Cir. 1994). As long as the record contains evidence that would support a reasonable belief that the action in question would restrict incompetent behavior and would protect patients or otherwise further quality healthcare, standard one is satisfied. *Gabaldoni*, 250 F.3d at 261. As the test is an objective one, "the subjective bias or bad faith of the peer reviewers is irrelevant." *Sugarbaker v. SSM Health Care*, 190 F.3d 905, 914 (8th Cir. 1999).

Defendants have presented documentation and testimony showing that the impetus for the peer review action was four separate cases. The record of this peer review action offered by Defendants in support of this motion is replete with evidence that serves as a basis for Defendants' well-documented concerns about Dr. Hinnant's medical judgment. More specifically, the minutes of the Surgical Case Review Committee and MEC, the Hearing Committee report, the MEC's recommendation to the Board, and the testimony of Defendants about the deliberations and findings

20

of the various peer review bodies reveal that Defendants had serious and well-founded concerns that Hinnant was failing to provide appropriate care to his patients at the Medical Center.  Ex. 1, Ex. 5, Ex. 7, Ex. 8, Ex. 9, Ex. 11, Ex. 16, Ex. 17, Ex. 19, Ex. 22, Ex. 23, Ex. 27, Mem. Supp. Summ. J.; Ex. 3, Ex. 7, Ex. 9, Ex. 14, Ex. 15, Ex. 16, Ex. 17, Mem. Reply.

Citing specific examples of its concerns, the Hearing Committee found Dr. Hinnant exercised poor medical judgment in each of the three recent cases and was further "greatly distressed" by Plaintiff's failure timely to see his patient in the ER/Nephrectomy case. Ex. 22, Mem. Supp. Summ. J.  The MEC's concerns about the deficient care Dr. Hinnant was providing are set forth extensively, among other places, in the minutes of its December 16, 2002 meeting.  Ex. 9, Mem. Reply. Plaintiff's concessions that he could have improved his care of the pediatric patient in numerous ways are memorialized in the minutes of the November 12, 2002 MEC meeting.  Ex. 11 at 5, Mem. Supp. Summ. J.  The Board's ultimate conclusion that Dr. Hinnant's privileges had to be revoked to protect the Medical Center's patients is revealed in the testimony about the Board's deliberations and decision.  Ex. 23 at ¶¶ 7-15, Mem. Supp. Summ. J.; Ex. 17 at ¶¶ 6-10, Mem. Reply.

The record also clearly reveals that Defendants' grave concerns about the four recent cases were heightened because Plaintiff had a history of problems with medical judgment and substandard care that included a prior peer review which resulted in Plaintiff undergoing re-training after eight patients died, several unexpectedly, under his care.  These recent cases, coupled with Dr. Hinnant's troublesome history, formed the totality of circumstances upon which Defendants' "reasonable belief" was based.[6]

---

[6] Bolstering the evidence that Defendants' actions were taken in the reasonable belief that they were furthering quality healthcare, no less than four urologists retained by Defendants for trial opined that Dr. Hinnant exercised poor medical judgment with respect to his treatment of the pediatric patient in multiple respects. Ex. 10, Ex. 12, Ex. 13, Ex. 15, Mem. Supp. Summ. J.  In addition, the two urologists who examined the wound care and flash fire cases

In response to Defendants' evidence related to the first HCQIA standard, Plaintiff first offers the opinion of Ralph Bard who says that the peer review action deviates from "reasonable due process" and represents a "malicious deviation from the standard of care." Mem. Opp'n Summ. J. at 22. Plaintiff relies heavily on Bard and others who opine that the peer review action fails to comport with due process and fails to satisfy HCQIA. These experts offer opinions on matters of law.

It is axiomatic that opinions on due process and other matters of law are inappropriate and inadmissible, as these matters are the province of the Court. *Adalman v. Baker, Watts & Co.*, 807 F.2d 359 (4th Cir. 1986). Even if this opinion was admissible, however, it fails to address the relevant issue under standard one – that is, based upon the evidence before them, did Defendants reasonably believe they were furthering quality health care through this peer review action.

Next, Plaintiff argues that Defendants failed to undertake this peer review action in the reasonable belief that they were furthering quality health care because Defendants never considered the data comparing Plaintiff's outcome, cost, utilization, and length of stay with that of his peers. Mem. Opp'n Summ. J. at 24. This is incorrect because, first, Plaintiff concedes that this information *was considered* by the Hearing Committee. *Id.* This information was also available to the MEC and was presented to the ultimate decision-maker in this matter , the Board of Trustees. In fact, Plaintiff himself presented this information. Ex. 1 at 21, Mem. Reply.

More importantly, this peer review action was not about conducting a comparative analysis of the kind of statistics Plaintiff presents. Instead, this peer review action was focused upon particular cases in which Plaintiff exhibited poor medical judgment. That the actual cases at issue,

agreed that Hinnant violated the standard of care and exercised poor medical judgment based on the factual findings of the Hearing Committee. Ex. 10, Ex. 15, Mem. Supp. Summ. J.

and not general statistical information about things such as length of stay, were the focus of this peer review action was entirely appropriate, and the admitted emphasis placed by the peer reviewers on the cases at issue certainly cannot be said to establish that Defendants were not acting in the reasonable belief that they were furthering quality care. *Pamintuan v. Naticoke Mem. Hosp.*, 192 F.3d 378, 389 (3d Cir. 1999) ("The focus of our inquiry under the HCQIA is not whether Dr. Pamintuan was or was not a substandard doctor in comparison to the other OB/GYNs at Nanticoke Memorial, but whether Nanticoke Memorial's disciplinary actions were justified after a reasonable effort to obtain the facts of the matter.").

Plaintiff then speculates that the MEC was not made aware of certain "prior reports" from experts who supported Plaintiff or perhaps "chose to ignore them." Mem. Opp'n Summ. J. at 25. This argument is unsupported by the evidence. Plaintiff presented opinions of Drs. Thompson and Vaught and could have presented others to the Medical Staff Hearing Committee, these opinions were available to the MEC, and Plaintiff presented them and made arguments based upon them to the Board of Trustees. Ex. 1, Ex. 2, Mem. Reply. The fact is that the Hearing Committee, MEC, and Board of Trustees simply found Plaintiff's experts unpersuasive. In particular, the members of the Hearing Committee stated that they did not believe Plaintiff's expert "answers to our satisfaction several concerns we have based on our review of the chart." Ex. 3 at 3, Mem. Reply.

Plaintiff contends that the actual cases at issue in this peer review action represent a "statistically insignificant" number of his total cases. Mem. Opp'n Summ. J. at 26. The fact that the majority of Plaintiff's cases did not involve serious complications, deaths, or breaches of the standard of care does not overcome the fact that the *actual cases under review* did. Any physician who has experienced serious problems can point to a body of "other cases" where no clinical

23

concerns are apparent.  This argument, therefore, does not establish that Defendants were not acting in the reasonable belief they were furthering quality health care.

Finally, Plaintiff maintains that the appearance of the phrase "start building the case" in the minutes-taker's handwritten notes from an MEC meeting rebuts the presumption that Defendants undertook this peer review action in the reasonable belief they were furthering quality health care. The Court disagrees.  First, the Court cannot agree that it is reasonable to infer from this stray remark that Defendants acted against Plaintiff as part of an economic conspiracy.  There is no evidence that the MEC Members, much less the ultimate decision-maker, the Board of Trustees, was motivated by malice or economic motives.  In fact, Plaintiff voluntarily dismissed his conspiracy and antitrust claims in this case.  Moreover, even if this stray remark could be said to be evidence of malice or ill will, it cannot overcome the overwhelming evidence that legitimate health care quality concerns drove this process.

In sum, Plaintiff offers no evidence that demonstrates Defendants were motivated to act for any reason other than their concern about Plaintiff's quality of patient care.  Plaintiff's other contentions fall far short of the preponderance-of-the-evidence showing necessary to overcome the presumption that Defendants undertook the peer review action in the reasonable belief that it was in furtherance of quality health care.  The Court therefore finds that Defendants have satisfied HCQIA standard one.

### 2.    Reasonable effort to obtain the facts of the matter

Standard two of HCQIA requires that the peer reviewers engage in a reasonable effort to obtain the facts relevant to the peer review action. 42 U.S.C. § 11112(a)(2).  A peer review action that consists of multiple levels of investigation and review generally satisfies this element of

HCQIA. *Imperial*, 37 F.3d at 1029. The Board of Trustees, the ultimate decision-maker, is entitled to rely upon the investigation conducted by the previous levels of the peer review process. *Gabaldoni*, 250 F.3d at 261-62.

Defendants' internal peer review documents and testimony reveal Dr. Hinnant's peer review action was a multi-level process that included more than adequate investigation and permitted Plaintiff to submit materials he deemed relevant at every level of this process.[7] Most notably, Defendants' peer review process included a fact-finding hearing at which Dr. Hinnant could present all the witnesses and other evidence he deemed relevant to this matter.

In response to Defendants' evidence on standard two, Plaintiff argues that there was not a reasonable effort to gather facts in the wound care and flash fire cases, in particular, because Drs. Perry and Stevens offered "exculpatory" letters regarding the wound care and flash fire cases, and these letters were not further investigated. Mem. Opp'n Summ. J. at 26. First, characterizing either of these letters as "exculpatory" is hyperbole. These physicians did not deny the alleged events took place; but instead stated that they did not witness or recall what had occurred. Ex. 5, Mem. Reply. Notably, the Medical Staff Hearing Committee, the independent three-physician peer review panel, found the so-called exculpatory letters unconvincing, as did each of the peer review bodies. Ex. 3, Mem. Reply.

More importantly, under HCQIA standard two, the probative question is whether a reasonable effort was made to investigate the facts that formed the basis for the flash fire and wound care cases. The Court finds that a reasonable effort was made to investigate these two cases. Two

---

[7] Defendants also offered an expert in hospital peer review who opined that Dr. Hinnant's peer review action included a more thorough investigation of the facts than hospital peer review actions he has observed elsewhere. Ex. 26 at 16, Mem. Supp. Summ. J.

separate peer review committees (Surgical Case Review and Medical Executive) conducted an investigation that involved consideration of the following: a complaint against Plaintiff signed by two nurses, an operating room technician, and a supervisor; a written statement from the Plaintiff; a review of the relevant medical charts; two interviews with Dr. Perry; and review of written statements of both Drs. Perry and Stevens. In addition, Plaintiff had an opportunity to introduce any testimony he chose on these cases before the Hearing Committee. Plaintiff's criticism is thus insufficient to meet his burden under HCQIA standard two. *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 469 (6th Cir. 2003) (conclusory statements attacking individual items of evidence does not overcome presumption of reasonable effort to obtain the facts when an "exhaustive review process" occurred that included reviews by several committees and a hearing at which testimony was taken and at which Plaintiff was represented).

Plaintiff next argues that obtaining an external review of the pediatric case after the Medical Staff Hearing Committee issued its report constitutes a failure to engage in a reasonable effort to obtain the facts of this matter. Mem. Opp'n Summ. J. at 27. The Court rejects this argument. HCQIA does not require external reviews at all, much less mandate that one occur at a particular time before the conclusion of the peer review action. 42 U.S.C. § 11112 The fact that an external review was obtained during this peer review action shows only that Defendants went beyond what was required of them to evaluate the facts of the case.

Plaintiff also avers that Defendants failed to conduct a reasonable investigation of this matter because the external review was "ignored" by the MEC. Mem. Opp'n Summ. J. at 28. Plaintiff offers no evidence for the proposition that the external review was ignored by the MEC, much less by the Board of Trustees. Indeed, the evidence shows this report was the subject of consideration

by the MEC, and it was presented to the Board.  Ex. 9 at 1-2, Ex. 1 at 23, 25 & 26, Mem. Reply.

Moreover, even if this contention were true, which it is not, this argument does not address the

relevant inquiry under standard two of HCQIA – *i.e.*, whether Defendants did a reasonable job of

gathering facts during the investigation.  Here Plaintiff argues about the *weight* the MEC may have

given to this expert's report.  This has nothing to do with whether Defendants satisfied their

obligation to gather facts.

Finally, Plaintiff alleges that differences in the opinions offered by the expert urologists

retained by Defendants to testify in this case means that Defendants failed to conduct a reasonable

investigation of the facts.  Mem. Opp'n Summ. J. at 29.  This argument is rejected, as the expert

opinions Plaintiff references[8] were obtained during this litigation and not during the internal

investigation that is the subject of inquiry in HCQIA standard two.

The Court finds the arguments offered by Plaintiff, when balanced against the evidence

offered by Defendants of reasonable investigation, fall far short of overcoming the presumption that

Defendants satisfy standard two of HCQIA.

### 3.    Adequate notice and hearing procedures

In order to obtain immunity under HCQIA, peer reviewers must provide a physician adequate

notice and hearing procedures during the peer review process. 42 U.S.C. § 11112(a)(3).  More

particularly an entity is deemed to have satisfied this element of HCQIA if it meets the safe harbor

requirements set forth in § 11112(b) or these requirements are waived by the physician.  *Wieters*, at

*6 (describing subsection (b) as a "safe harbor" for the notice and hearing elements of HCQIA).

---

[8] While these experts (three pediatric urologists and one general urologist) have not offered opinions identical in all respects regarding the cases at issue, these experts do all opine that Dr. Hinnant's care was substandard and that he exercised poor medical judgment.  Ex. 10, Ex.12, Ex. 13, Ex. 15, Mem. Supp. Summ. J.

Even if the requirements in subsection (b) have not been met in every technical sense, however, peer reviewers still satisfy standard three if the physician was provided notice and hearing procedures that are fair under the circumstances. 42 U.S.C. § 11112(b)("A professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section.").

Defendants offered evidence that Dr. Hinnant, at every stage of the process, received timely and appropriate notices that complied with the requirements in subsection (b). The record reveals that the hearing procedures used by Defendants also complied with the requirements in subsection (b). Hinnant received proper notice of hearing before the Hearing Committee, and he received a list of witnesses the MEC expected to call. He had the right, and exercised the right, to have legal counsel present, and he was permitted to call and cross-examine witnesses. The hearing panel did not contain any of his economic competitors. Hinnant was allowed to submit, and did submit, a written statement at the conclusion of the hearing, and Hinnant was provided a written report of the Hearing Committee's findings and notice of the Board's decision. 42 U.S.C. § 11112(b).

In response, Plaintiff offers a multitude of arguments purportedly targeted at standard three of HCQIA. The vast majority of these arguments, however, fail to challenge Defendants' evidence that the peer review action satisfied the statutory safe harbors for notice and procedure. Instead, Plaintiff offers contentions about notice and procedures that, even if true, do not overcome the presumption the Defendants provided adequate notice and hearing procedures.

Plaintiff argues that the MEC's "bases for revocation" of Plaintiff's privileges "totally changed" from its November 14 notice to its December 17 report to the Board. Mem. Opp'n Summ. J. at 40. More specifically, Plaintiff argues that the November 14 notice cites to three cases only,

while the December 17 report to the Board expands the basis to include "a seven-year period." *Id.* Review of these letters reveals the November 14 letter specifically references three cases, the recent reprimand, and *Plaintiff's history of disciplinary action.* Ex. 14, Mem. Reply. The MEC's December 17 recommendation, while more specific, did not change this focus and, in fact, had as an attachment the original MEC notice of November 14. Ex. 15 at 2, Mem. Reply. Review of the MEC minutes at which the December 17 recommendation was formulated clearly reveals that the focus of this peer review process did not substantially change. Ex. 9, Mem. Reply. Rather than being inconsistent with the November 14 notice, the specific grounds for the recommendation set forth in the December 17 report, instead, describe many of the health care quality concerns that lead the MEC to initiate the peer review action against Plaintiff in the first place.[9]

Plaintiff contends that the peer review process was inherently unfair because the MEC took into consideration evidence of the peer review of Dr. Hinnant's cases without notifying Plaintiff. The evidence on which Plaintiff relies in the minutes of the MEC's November 12, 2002 meeting in which reference is made to a "brief discussion of recent generic screens." Ex. 11 at 7, Mem. Supp. Summ. J. The minutes contain no suggestion, however, and Plaintiff supplies none from the record, that the MEC relied on such evidence to support its recommendation. Moreover, there is no evidence that such information was provided to the Board of Trustees, the final decision-maker in this peer review action.

---

[9] Even if some of the MEC's specific concerns shifted or changed over time, this change does not rebut the presumption of fair process if concerns of health care quality remain at the forefront during the peer review action. *Sugarbaker v. SSM Health Care*, 190 F.3d 905, 913 (8th Cir. 1999) ("The fact that some of the specific concerns shifted or changed over time does not rebut the presumption that St. Mary's restricted Dr. Sugarbaker's privileges 'in the reasonable belief that the action was in the furtherance of quality health care.'").

Plaintiff attempts to bolster his arguments on standard three by offering more expert testimony on the law. Mem. Opp'n Summ. J. at 30. Inappropriate and inadmissible, these opinions cannot overcome the statutory presumption HCQIA standard three was met. Next Plaintiff accuses the MEC of being made up of "company men" who were biased against Plaintiff. *Id.* at 31. This argument is rejected as it is unsupported by any evidence.[10] The only applicable safe harbor that addresses composition of a peer review committee is section 42 U.S.C. § 11112(b)(3)(A)(iii), which states, *inter alia*, that the *hearing panel* should not contain any of Plaintiff's economic competitors. Plaintiff concedes that his panel, the Medical Staff Hearing Committee, did not contain any of his economic competitors. Mem. Opp'n Summ. J. at 15.

Plaintiff's next argument is directed to the notice and procedure safe harbor regarding witness lists. Plaintiff complains that certain witnesses on the witness list provided by the MEC did not appear at the hearing resulting in an "inaccurate witnesses list." Mem. Opp'n Summ. J. at 35. This safe harbor section requires that "a list of witnesses (if any) *expected to testify* at the hearing on behalf of the professional review body" be provided to Plaintiff. 42 U.S.C. § 11112(b)(2)(B)(emphasis added). Plaintiff concedes that the Medical Center supplied Plaintiff with a witness list. Mem. Opp'n Summ. J. at 36. It is undisputed that the MEC does not have subpoena power to compel witnesses to attend a Medical Staff Hearing Committee, and thus it can only request that witnesses attend.

The evidence reveals that the physician about whose absence Hinnant now complains could not be present at the hearing because his wife was sick with the flu, and he needed to be home for his six-month-old child. Ex. 8 at 178-79, Mem. Reply. Moreover, one of the nurses did not appear

---

[10] The MEC is elected by the Medical Staff. Ex. 10, at 18 & 26, Mem. Reply.

because she had to work the hospital floor that night.  Ex. 11 at 53-54, Mem. Reply.  Prior arrangements were made by Defendants for these witnesses to attend.  It was only when the witnesses were called to testify during the proceeding that the Defendants' representatives were advised that these witnesses were not available.  When the MEC provided its witness list to Plaintiff, it expected those persons to be present.  As such, the Court finds that Defendants cannot be found to have violated this notice and procedure safe harbor.

Further, if Plaintiff desired to take testimony from individuals who could not appear at the hearing at the time scheduled, he could have requested that the hearing be held open so that these witnesses' testimony could be obtained at a later time.  Plaintiff did not make this request.  Ex. 2 at 139-41, Mem. Reply.  Thus, by failing to request that the hearing be held open, Plaintiff waived his right to seek this testimony.  For this additional reason, Plaintiff's complaints about the "inaccurate" witness list as well as his claims that he was "unable" to cross-examine these witnesses are rejected.

Next, Plaintiff argues that the MEC should not have made a recommendation regarding Plaintiff's privileges after the Medical Staff Hearing Committee made its report, and instead the matter should have proceeded directly to the Board of Trustees for review.  Mem. Opp'n Summ. J. at 37-38.  This argument is rejected, as it does not address any of the notice and procedure safe harbors in the third HCQIA standard.  Additionally, this procedure is a well-established one that enables the MEC to reconsider its position, if necessary, after reviewing the materials generated by the Medical Staff Hearing or, as in this case, so it can consider suggestions of the hearing panel.  Ex. 4 at 17, Mem. Reply; *see also Imperial*, 37 F.3d at 1029 (hospital whose MEC reconsidered its recommendation after the physician's case was presented to the hearing panel, and before the case proceeded to the Board of Trustees entitled to summary judgment on HCQIA).

Plaintiff then argues that the MEC ignored opinions offered by the external reviewer and one of Plaintiff's experts. Mem. Opp'n Summ. J. at 39. However, the evidence shows that Plaintiff presented his expert's opinions to the MEC, Medical Staff Hearing Committee, and Board of Trustees. Ex. 3 at 3, Ex. 1 at 25, 28, 33, 34, 60, 61, Mem. Reply. The external review of the pediatric case was also presented and considered by the MEC and Board, which made the ultimate decision in this matter. Ex. 9 at 1-2, Ex. 1 at 34. Plaintiff essentially argues that these opinions were favorable to Plaintiff and that they were not given the weight they should have been. This assertion is rejected, however, as it is disconnected from any of the HCQIA notice and procedure safe harbors.

Next, Plaintiff urges that the hospital failed to provide him with an appropriate written notice of its decision containing the basis for the decision. Plaintiff's Mem. Opp'n Summ. J. at 37. The Board of Trustees provided Plaintiff with a letter that informed him of its decision to revoke his privileges. Ex. 16, Mem. Reply. This letter states that the Board revoked Plaintiff's privileges "as recommended" by the MEC. While this letter does not contain a detailed statement of the basis for the decision, it at least incorporates by reference the MEC's bases for revocation.

Even if the letter falls short of the safe harbor standard in § 11112(b)(3)(D(ii), this technical deficiency alone does not overcome the presumption that the entirety of the notice and procedure provided to Plaintiff in this matter was "fair to the physician under the circumstances." 42 U.S.C. § 11112(a)(3); 42 U.S.C. § 11112(b) ("A professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section."); *Wieters,* at *6 (Though physician established that the procedures in his peer review action did not always comply with the bylaws and safe harbor provisions [subsection (b)],

32

his challenge on this element of HCQIA fails because he did not show by a preponderance of the evidence that the hospital treated him unfairly under the circumstances.").

Plaintiff makes two final arguments on HCQIA standard three. First, Plaintiff argues that the language regarding his suspension and revocation in the National Practitioner's Databank ("NPDB") "conflicts with" the language in the aforementioned letters regarding the basis of the peer review action. Mem. Opp'n Summ. J. at 41. There is no notice and procedure section in HCQIA, however, that calls for the language in the NPDB regarding the basis for his peer review sanction to be identical to correspondence sent to Plaintiff during his peer review action. Furthermore, comparing the NPDB report with the November 14 and December 17 letters from the MEC reveals that, while they do not use the same language, the descriptions of the bases for the peer review action are not inconsistent with each other.

In sum, the Court finds Plaintiff has failed to offer evidence that can overcome Defendants' evidence and the presumption that Defendants satisfied HCQIA standard three.

### 4.    Action taken in the reasonable belief that it was warranted by the facts known

The fourth element of HCQIA is often considered in conjunction with the first, as they are clearly related. *Gabaldoni,* 250 F.3d at 263 n.7. The fourth HCQIA standard is satisfied if Defendants could have reasonably believed that the peer review action taken was warranted by the facts available. *Imperial,* 37 F.3d at 1030. "The role of the federal courts on review of [peer review] actions is not to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the . . . termination of medical staff privileges." *Bryan v. James E. Holmes Reg. Med. Ctr.,* 33 F.3d 1318, 1337 (11th Cir. 1994). A plaintiff must show the facts relied upon for the

decision were so obviously mistaken or inadequate that reliance upon them was unreasonable. *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 471 (6th Cir. 2003).

The Court has already found that Plaintiff cannot overcome the presumption that Defendant undertook this action in the reasonable belief that it would further quality healthcare. The evidence discussed at length above also reveals that Defendants believed revocation of Dr. Hinnant's privileges was warranted. A review of the MEC minutes and related testimony conclusively establish that Defendants believed that Hinnant's problems with medical judgment and his inability to take responsibility for his inappropriate actions, manifested by the recent cases, were problems that had followed him throughout his career. Ex. 11 at 7, Ex. 27 at 3-5, Mem. Supp. Summ. J. Defendants had tried, but failed, to remedy these problems through a prior peer review sanction that was comprised of retraining for a year and a proctoring program. Ex. 1 at ¶¶ 12-16, Mem. Supp. Summ. J. Defendants believed that the only way to ensure patients of the Medical Center would receive safe and appropriate care was to revoke Hinnant's privileges. Ex. 9 at 5, Ex 17 at ¶11, Mem. Reply; Ex. 23 at ¶15, Mem. Supp. Summ. J.

Plaintiff's arguments on HCQIA standard four rely largely on his characterization of the Hearing Committee's report as having "cleared the Plaintiff." Mem. Opp'n Summ. J. at 44. This contention, however, is impossible to reconcile with the Hearing Committee's report that states Plaintiff "exercised poor clinical judgment and failed to meet the standard of care" in the wound care case, thereby "causing harm to both himself and the patient." Ex. 3 at 2, Mem. Reply. The report further stated that Plaintiff "disregarded the warning" offered by the staff about the flammable preparation and "endangered" the patient, himself, and the staff present, and that Plaintiff "used poor clinical judgment" during the care of the pediatric patient. *Id.* at 2 & 4. The report also noted that

the hearing panel was "greatly distressed" by Plaintiff's failure to go to the ER to care for his critically ill patient. *I d.* at 4.

While the report did recommend reinstatement of Plaintiff's privileges, with the exception of abdominal pediatric surgery, pending the MEC's consideration of an external review and further consideration of Plaintiff's prior peer review problems, it expressly recognized that "suspension or revocation of his privileges could be warranted" following the MEC's completion of the steps the panel recommended. *Id.* at 5. Clearly, this report is not an exoneration of Plaintiff. In fact, it affirms the MEC's findings concerning Plaintiff's clinical practice and is further evidence that Defendants reasonably believed the peer review action was warranted by the facts known.[11]

Plaintiff argues also that the opinions of the expert urologists named by Defendants to testify at trial are of "little or no relevance" to whether Defendants satisfied standard four because these opinions were obtained after this peer review action was complete. Mem. Opp'n Summ. J. at 44. Plaintiff's argument is of no moment. Even without their experts' opinions, Defendants have offered more than sufficient evidence on standard four to secure HCQIA immunity. Accordingly, the Court finds that Plaintiff has failed to overcome the presumption that Defendants satisfied HCQIA standard four.

In conclusion, Defendants offered an overwhelming quantity of highly probative evidence showing that the peer review action in question satisfied the four HCQIA standards. Even viewing the facts in the light most favorable to Plaintiff, as the Court must for purposes of summary

---

[11] Even if the Medical Staff Hearing Committee's report were as favorable as Plaintiff contends, this fact alone could not rebut the presumption that Defendants satisfied prong four of HCQIA. *Gabaldoni*, 250 F.3d at 261 (the fact that "several committees" recommended reappointment is not enough to prevent summary judgment in favor of Defendants on HCQIA in light of the other objective evidence relied upon by Board to revoke physician's privileges).

judgment, Plaintiff has fallen far short of offering evidence upon which a reasonable jury could find, by a preponderance of the evidence, that Defendants failed to meet the HCQIA standards. Plaintiff has not overcome the statutory burden with which he was faced, and Defendants are entitled to the immunity from damages provided by HCQIA. 42 U.S.C. § 11111(a)(1). Defendants' motion for summary judgment on HCQIA immunity is, therefore, granted.

**D.    Plaintiff's Remaining Causes of Action are Dismissed**

**1.    Plaintiff has abandoned his request for injunctive relief**

Plaintiff seeks damages with each of his remaining legal claims. Am. Compl. at ¶ 62 (unfair trade practices); ¶ 74 (negligence); ¶ 81 (breach of contract); ¶ 89 (interference with contract); ¶ 93 (intentional infliction of emotional distress). The Court's ruling above makes Defendants immune from claims for damages made by Plaintiff in this suit. HCQIA immunity, however, does not resolve claims for injunctive relief that have been preserved by a plaintiff.

Defendants in their motion for summary judgment sought dismissal of all of Plaintiff's remaining claims Mot. Summ. J. Specifically, Defendants asserted that the application of HCQIA immunity "mooted Plaintiff's remaining causes of action." Mem. Supp. Summ. J. at 41. In response, Plaintiff did not challenge Defendants' assertion, making *no mention* of a continued interest in pursuing injunctive relief either in his sixty-nine page brief or in his oral argument. The Court finds Plaintiff's failure to raise the issue of injunctive relief during Defendants' efforts to obtain summary judgment on the entire complaint constitutes an abandonment of that remedy. *Imperial*, 37 F.3d at 1031 (physician abandoned claim for an injunction made in his prayer for relief by making "no overture to the district court to suggest that he had a continuing interest in pursuing

36

injunctive relief" during Defendants' effort to dismiss the entire complaint through summary judgment).

As Plaintiff cannot recover damages by operation of HCQIA and as he has abandoned his claim for an injunction, no basis exists for the continued prosecution of Plaintiff's remaining causes of action. Therefore summary judgment is granted on Plaintiff's remaining legal claims in this suit.

### 2.        Injunctive relief is not appropriate in this case

Even if Plaintiff had not abandoned his claim for injunctive relief, the Court finds that injunctive relief is inappropriate in this case. Based on the prayer in his Amended Complaint, the injunctive relief Plaintiff seeks is an order reinstating him to the medical staff at the Medical Center. South Carolina law, however, is clear that credentialing decisions of *private* hospitals[12] are not subject to judicial review and reversal. *Wood v. Hilton Head Hosp., Inc.*, 292 S.C. 403, 356 S.E.2d 841, 842 (1987) ("It is well settled in South Carolina, and throughout the country, that it is improper for the courts to review the decisions of governing boards of private hospitals concerning the staff privileges of practitioners."); *see also Gowan v. St. Francis Cmty. Hosp.*, 275 S.C. 203, 268 S.E.2d 580 (1980), *cert. denied*, 449 U.S. 1062 (1980) (affirming denial of Plaintiff physician's request for injunctive relief holding that a private hospital's decision to grant or deny privileges is un-reviewable). The Medical Center is a private institution and, therefore, its decision to remove Dr. Hinnant from its medical staff cannot be reversed under South Carolina law.

Even if Plaintiff's request for permanent injunctive relief could be granted under South Carolina law, it would not be appropriate to do so. The decision to grant the equitable remedy of a

---

[12] Credentialing decisions of public hospitals, on the other hand, are subject to due process review because public entities are required to provide due process pursuant to the U.S. Constitution. *See In re Zaman*, 285 S.C. 345, 329 S.E.2d 436, 437 (1985) (judicial review of peer review action of public hospital based upon Fourteenth Amendment).

permanent injunction is wholly discretionary. Courts have traditionally been particularly reluctant to grant injunctive relief that requires former litigants to work closely with each other again. 25 Williston on Contracts § 67:102 (4th ed. 2004) (equity will deny specific performance of employment contracts based in part upon the "repugnance to the idea of compelling the continuance of a close personal relationship now grown hostile and bitter as a result of the controversy and resulting litigation. . ."); *Pingley v. Brunson*, 272 S.C. 421, 252 S.E.2d 560 (1979) (reversing decree of specific performance of a contract for personal services). While the Court recognizes that Defendants and Plaintiff did not have an employment or contractual relationship, the nature of their former relationship makes application of these principles appropriate.

It is clear from the Court's review of the evidence in the record offered by both Defendants and Plaintiff that restoring Dr. Hinnant to the medical staff is not in the best interests of the physicians, administration, nursing staff, and, most importantly, the patients of the Medical Center. The hospital setting requires hospital physicians, administration, and staff to work together to serve their patients. It cannot be disputed that the MEC Members and administrators no longer believe that Dr. Hinnant can consistently provide safe and appropriate care to the Medical Center's patients. There is also no question that Dr. Hinnant no longer views the Medical Center's peer review process as a legitimate tool to help ensure patients receive quality health care. That being the case, it would be an abuse of discretion for the Court to restore Dr. Hinnant's privileges and expect the parties to work together effectively in the future.

IV.   **<u>CONCLUSION</u>**

In light of the foregoing discussion, it is the judgment of this Court that all Defendants are, pursuant to HCQIA, immune from damages sought in this suit. Further, it is the judgment of this

38

Court that Plaintiff is not entitled to injunctive relief.  Therefore, the court **DISMISSES**, *with prejudice*, Plaintiff's claims under 15 U.S.C. §§ 1-2, S.C. Code Ann. §§ 39-3-10, 39-3-130, 44-113-30, 44-113-60(B), and Plaintiff's defamation, civil conspiracy, South Carolina peer review immunity, and of HCQIA claims.  Furthermore, the Court **GRANTS** Defendants' motion for summary judgment as to Plaintiff's unfair trade practices, negligent peer review, breach of contract, tortious interference with contract, and intentional infliction of emotional distress claims.

**IT IS SO ORDERED**.

Signed this 24th day of August, 2005, in Spartanburg, South Carolina.


s/ Henry F. Floyd
HENRY F. FLOYD
UNITED STATES DISTRICT JUDGE